IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

CLINTON M. TURNER                                                    PLAINTIFF


v.                          Civil No.   4:23-cv-04050-SOH-BAB

JAIL ADMINISTRATOR STEVE OTWELL,
Nevada County Detention Center (NCDC);                    DEFENDANTS
LIEUTENANT KAREN GHORMLEY,
NCDC; GUARD ASHLEY CORNELIUS,
NCDC; and DARRELL ELKIN, APRN,
County Facility Healthcare of Arkansas, LLC


### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Clinton M. Turner ("Turner"), filed this civil rights action pursuant to 42 U.S.C.

§ 1983.  He proceeds *pro se* and *in forma pauperis*.  While he was incarcerated in the Nevada

County Detention Center ("NCDC"), Turner contends the Defendants violated his federal

constitutional rights by not providing him with adequate medical care.

The case is before the Court on the Motion for Summary Judgment filed by Separate

Defendant Elkin (ECF Nos. 27-29) and the Motion for Summary Judgment filed by the Nevada

County Defendants (ECF Nos. 31-34).  Turner has responded to both Motions.  (ECF Nos. 35 &

39).  Pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Honorable Susan O. Hickey,

Chief United States District Judge, referred this case to the undersigned for the purpose of making

this Report and Recommendation.

1

# I.    BACKGROUND

Turner was booked into the NCDC on February 7, 2023, on pending criminal charges.[1] (ECF No. 31-1 at 3.[2]  Turner informed the booking officer that he was a diabetic.  *Id.* at 5.  On the line where Turner was to list all prescribed medications, he simply wrote "yes."  *Id.* at 6.  There is no indication in the booking records that the booking officer or anyone else followed up to determine what medications Turner was referring to.  *Id.*   No medical intake records were submitted other than this.

Defendant Elkin contracts with Nevada County to provide medical services to inmates. (ECF No. 29-1 at 1).  He indicates he is a licensed healthcare practitioner and has been practicing in the correctional healthcare arena for the past twenty-five years.  *Id.*

According to Defendant Elkin, inmates have access to a digital kiosk for submitting requests, grievances, and medical requests.  (ECF No. 29-1 at 1).  Defendant Otwell reviews all submissions and "places any medical requests or grievances concerning medical care into my box at the jail."  *Id.*  Defendant Elkin visits the NCDC once or twice a week, retrieves the medical requests from his box, and begins interviewing and examining "each" inmate.  *Id.*  Defendant Elkin does not indicate what, if any, steps he takes to do an initial assessment of incoming inmates to ensure they are given appropriate care.

Defendant Elkin indicates he charts by exception which means "only exceptions to my baseline findings would be charted.  If nothing is charted, that patient's status is assumed to match the baseline."  (ECF No. 29-1 at 2).

---

[1] In his deposition, Turner testified he went to court on his criminal charges on June 22, 2023, and was convicted.  (ECF No. 31-2 at 7).
[2] All references to the summary judgment record are to the Case Management/Electronic Case Filing ("CM/ECF") document and page number.

It appears the first medical request Turner submitted about his diabetes was on March 28, 2023.  (ECF No. 31-1 at 10).  Turner indicated he had been diagnosed with diabetes while incarcerated in the Arkansas Division of Correction ("ADC") and had advised NCDC staff he was diabetic when he was booked in.  *Id.*  Despite this, Turner stated he had been there for sixty days and had not seen a doctor or had his blood sugar level checked.  *Id.*   Further, he said he had been suffering from bad headaches.  *Id.*  Turner also reported that he had a hernia that ruptured.  *Id.* He indicated he was suffering from stomach aches and could not keep much food down.  *Id.*   On the bottom of the form, a notation dated March 31, 2023, was made.  *Id.*  The noted said: "please send to ER for hernia reduction."  *Id.*

On March 30, 2023, Turner submitted a "grievance request."  (ECF No. 31-1 at 9).  Turner said he still had not been seen by a doctor or a nurse.  *Id.*  When he was given insulin, he stated he did not even know what dose he had been prescribed and the vial was unlabeled.  *Id.*  The officer merely told him it was his medication and laid a needle and a bottle of insulin on top of the cart. *Id.*  Turner asked how much he should take and the officer responded he did not know.  *Id.*  Turner took the amount of insulin he assumed was good.  *Id.*  He then began seeing spots, got light headed and hot, and fainted.  *Id.*   Turner called his mother and asked her to call an ambulance.  *Id.* According to Turner, when the paramedics arrived his sugar was 300 and getting higher and his blood pressure was 254/117.  *Id.*  Turner said he felt like he was going to die.  *Id.*

On April 4, 2023, Turner wrote that he had still not seen a doctor or nurse; he was not being allowed to check his blood sugar; he was not being given his insulin at the scheduled time; he did not know what dose of insulin he was on; and his blood sugar was constantly fluctuating.  (ECF No. 31-1 at 11).

Defendant Elkin indicates his first visit with Turner was on April 4, 2023, to discuss Turner's insulin dosage.  (ECF No. 29-1 at 2).   Defendant Elkin notes that when Turner was admitted to the facility, he "could NOT remember or was not forth coming with what type or how much insulin he was taking at home.  Inmates frequently do this in hopes of getting a Medical OR.[3]"  *Id.*

Defendant Elkin states he "spoke in detail with the nurse who was on site," presumably Defendant Ghormley.  (ECF No. 29-1 at 2).  Turner was "started on 6 units of Lantus (long-acting insulin) twice a day and placed on a sliding scale [dose of insulin] one hour after each meal with regular insulin (fast acting)."  *Id.*  The dosage of long-acting insulin is adjusted depending on how often it is necessary to treat his blood sugar after each meal with the sliding scale.  *Id.*  Because Turner's sugars were 198 and 200, Defendant Elkin states he increased the dosage of the long-acting insulin to "10 units twice a day and [Turner] was continued on the sliding scale."  *Id.*

Defendant Elkin indicates he also evaluated Turner's umbilical hernia which had been present for five years without change.  (ECF No. 31-1 at 11).  Defendant Elkin found the hernia was easily reduced and pain free.  *Id.*  Turner was started on Omeprazole for his indigestion.  *Id.*

Turner was seen at Wadley Regional Medical Center for evaluation of his umbilical hernia. (ECF No. 35 at 4-6).  Turner was advised to see his primary care physician for follow-up.  *Id.* at 5.

On April 16, 2023, Turner submitted a request stating he needed to see the doctor about his diabetes and hernia.  (ECF No. 29-1 at 2).  Defendant Elkin saw Turner on April 18, 2023.  (ECF No. 29-1 at 2).  Turner complained of constipation and was prescribed a laxative.  *Id.*   Turner's

---

[3] It is not clear how Defendant Elkin obtained this knowledge.  There is nothing in the booking medical questionnaire or in the summary judgment record to support this statement.

blood sugar levels were noted to be 243 and 300. *Id.* at 3. The dosage of long-acting insulin was increased to 15 units twice a day and Turner was continued on a sliding scale. *Id.*

On April 22, 2023, Turner complained his insulin was not being given to him at certain times and his blood sugar level being not being checked. (ECF No. 31-1 at 12). Turner stated he had not been seen by a doctor, no blood work had been done, and the doctor was not looking at his sugar levels. *Id.* Turner questioned how the doctor could adjust his insulin without doing blood work and checking his sugar levels. *Id.* Turner said he was not taking up to four shots of insulin per day. *Id.* Turner indicated he thought they were trying to kill him. *Id.* He said he was going to start refusing any treatment. *Id.* On the bottom of the form, someone wrote that the long-acting insulin should be increased to fifteen units and the sliding scale insulin should be given three times daily one hour after meals. However, Defendant Elkin's affidavit does not refer to this date. (ECF No. 29-1). It is therefore unclear who made this notation. *Id.*

On May 2, 2023, Turner complained that the medical staff who were drawing up his insulin were damaging the needles which caused him pain at the time of injection and bruising afterwards. (ECF No. 31-1 at 13). Turner stated the administration was inconsistent; his AIC had not been checked; and staff did not even know which insulin was which and when he should take it. *Id.* If he put in a medical request, he was asked what he needed. *Id.* Turner indicated he was not a doctor and could not diagnose himself. *Id.* He again suggested they were trying to kill him and asked what he should do and who he should talk to. *Id.* At the bottom of the form, a notation is made that Turner refused to be seen on May 7, 2023, because he had not turned in a medical request. *Id.*

Turner submitted a grievance on May 7th indicating there were no alcohol pads to use when he administered his insulin. (ECF No. 31-1 at 8-9). He complained that his blood sugar was

being checked after his meals and not before.  *Id.* at 9.  He stated there were "more things going on will explain."  *Id.*

Turner submitted a medical request on May 8, 2023.  (ECF No. 31-1 at 14).  He asked that the nurse or Defendant Elkin review the blood sugar log and determine if he needed more slow acting insulin and less fast acting insulin.  *Id.*  Turner indicated he would like to cut down the number of shots he was taking.  *Id.*  Turner also stated he needed a hernia belt for his naval not the one for his groin that he had been sent.  *Id.*  Finally, Turner asked that his insulin, syringes, alcohol pads, test strips, and lancet be reordered.  *Id.*

Defendant Elkin saw Turner on May 12, 2023.  (ECF No. 29-1 at 3).  Dr. Elkin noted Turner's umbilical hernia was unchanged.  *Id.*  Turner's blood sugars levels were 287 and 277.[4] *Id.*  The dosage of long-acting insulin was increased to 20 units twice a day and Turner was continued on a sliding scale.  *Id.*

On May 19th, May 20th, and May 21st, Turner complained that his insulin was not being refrigerated.  (ECF No. 31-1 at 9).  A "khipp" replied that he had been there for two of the days and had put the insulin in the refrigerator.  *Id.*

Turner submitted a medical request on May 26, 2023.  (ECF No. 31-1 at 15).  Turner stated his hernia was swollen, could not be reduced, and the pain was severe.  *Id.*

The same day, Turner was seen by Defendant Elkin.  (ECF No. 29-1 at 3).  Defendant Elkin indicates Turner was concerned about his hernia but it was easily reduced and unchanged since his admission to the facility.  *Id.*  It was noted that Turner made no complaints of constipation or diarrhea and was eating well.  *Id.*

---

[4] The notations made on the request form do not contain any blood sugar levels.  (ECF No. 29-2 at 5).

On June 7, 2023, Turner submitted a medical request due to diarrhea and severe abdominal pain. (ECF No. 31-1 at 16).   A notation is made on this form that Turner refused to see medical staff on June 16th. *Id.*

Tuner submitted a grievance on June 14, 2023, stating he had been given another inmate's insulin. (ECF No. 31-1 at 8).  He indicated he was supposed to be taking Lantus and he was given a different type of insulin. *Id.*  Turner complained that the officers were not given any diabetic medical training from the doctor or nurse. *Id.*

On June 17, 2023, Turner submitted a grievance complaining that he was on insulin on a sliding scale and there had been no way to check his sugar levels that day. (ECF No. 31-1 at 8).

A blood sugar log indicates Turner's sugar level was checked three times on March 29, 2023 (303, 284, and 238), attempts were made to check it five times on March 30th (refuse, 220, refuse, 204, 239), and once on March 31st (119). (ECF No. 31-1 at 17).  The next blood sugar log does not begin until April 16th and continues to April 27th, it shows:

- April 16 (233, 282, 327);

- April 17 (222, 283);

- April 18 (243, 300, 243);[5]

- April 19 (159, 284, 317);

- April 20 (213, 252, 252);

- April 21 (177 & 203);

- April 22 (318 & 342);

---

[5] In his affidavit, Defendant Elkin indicates Turner's blood sugar for the first three days of incarceration averaged 266.  Defendant Elkin continues providing the three-day average for the next nine days.  The difficulty is, Defendant Elkin does not indicate which dates he considered to be the first three days of Turner's incarceration.  It is undisputed that Turner's blood sugar was not recorded prior to March 29, 2023.

- April 23 (no checks recorded);

- April 24 (191, 251, 247);

- April 25 (152 & 261);

- April 26 (184);

- April 27 (187).

(ECF No. 31-1 at 18-20).

Medical records indicate that on March 29, 2023, Turner was prescribed Glar Sol 100U/ML insulin to be administered by subcutaneous injection twice a day 15 units each time. (ECF No. 31-1 at 21). On April 13, 2023, Turner was prescribed "'R' insulin-for BS" to administered by subcutaneous injection on a sliding scale one hour after meals. *Id.* No other entries appear on the inmate medications list for Turner.

According to a "inmate medical refusal" log covering April 17 to June 20, 2023, Turner refused his sliding scale "R" insulin injection on twenty-six occasions. (ECF No. 31-1 at 22-24). There is a total of sixty-eight days between April 17th and June 23rd which would result in two-hundred-and-four potential after meal injections.[6]

During his deposition, Turner was asked about his use of insulin prior to his incarceration.[7] (ECF No. 31-2 at 8). He indicated he did not have an active prescription for insulin because he had no healthcare coverage. *Id.* However, until about two weeks prior to his incarceration, a friend Turner had been using a friend's insulin to take two shots per day. *Id.* at 9. During the 365 days prior to his booking, Turner estimated he took insulin approximately half the time. *Id.* During

---

[6] The Court used April 17, 2023, as the start date of the log instead of February 7, 2023, because it is the first date a refusal was recorded.

[7] The deposition was taken by counsel for Defendants Otwell, Ghormley, and Cornelius. As a result, Turner's claims against Defendant Elkin were not developed.

that time, Turner indicated he had no serious medical issues with his diabetes and did not have to go to the hospital.  *Id.*  When he could not afford the insulin, he tried to maintain his diabetes through diet and exercise.  *Id.* at 10.  He checked his blood sugar every day.  *Id.*

When he was booked in, Turner stated he was a diabetic and on medication.  (ECF No. 31-2 at 13).  Despite this, Turner was not seen by a doctor or nurse and did not receive any insulin.  *Id.*

Within three weeks of being booked in, Turner testified he started complaining about his blood sugar being high.  (ECF No. 31-2 at 11).  He was having bad headaches, could not see, and was getting dizzy.  *Id.*  Turner said he filed medical requests and grievances and told the correctional officers and asked them how he could see the doctor.  *Id.*  Turner also started calling his family and they started calling the detention center trying to obtain diabetic treatment for Turner.  *Id.*

Turner testified he did not start receiving insulin until after his mother sent Pafford Ambulance Service to the NCDC for him.  (ECF No. 31-2 at 13-14).  Turner stated that the correctional officers would not call an ambulance despite him telling them he felt bad.  *Id.*  at 13.  According to Turner, when he was checked by paramedics he was "at stroke level."  *Id.*  Turner could not recall the date the ambulance came.  *Id.* at 14.  However, he believed it was the next day when he started receiving insulin.  *Id.* at 13.

Turner did not recall any other occasions when he almost went to the hospital or had a medical incident because of not receiving his insulin.  (ECF No. 31-2 at 19).  However, Turner believed the lack of insulin and the uncontrolled blood sugar caused him both brain and heart damage.  *Id.* at 19-20.  The only time he passed out completely was the night the ambulance was

called.  *Id.* at 20.  However, the high blood sugar caused him to feel sleepy; and he did not "even want to get out of bed.  You just lay there, and, I mean, you feel terrible."  *Id.* at 20-21.

Turner testified the first time he saw anyone was when a female came to the hallway, spoke to him, and wrote something down on a piece of paper.  (ECF No. 31-2 at 11-12).  According to Turner, "that was it."  *Id.*  Turner told her that he needed his insulin and showed her his hernia.  *Id.* at 12.  Turner did not know if she was "the doctor or a nurse or what she was."  *Id.* at 12.  He did know her name.  *Id.*

After Turner began receiving insulin, he testified the officers who drew up the insulin damaged the needles causing him pain and causing bruising.  (ECF No. 31-2 at 14-15).  Turner believed he was seen by Defendant Elkin twice.  *Id.* at 15.  Turner testified Defendant Elkin was rude, failed to monitor his diabetes, and failed to ensure Turner was receiving the correct dose of insulin.  *Id.*  On one occasion, Turner indicated his insulin got switched from 20 units to only 5 units causing his blood sugar to shoot up.  *Id.*  Turner indicated there was some confusion between Defendant Elkin, the pharmacy, and the NCDC.  *Id.* at 16.

With respect to Defendant Otwell, Turner testified he believed the duties Defendant Otwell delegated, including Turner's medical care, were not appropriately carried out.  (ECF No. 31-2).  Turner believed there was a chain of command from him down to the officers who were giving him medical treatment.  *Id.*  In Turner's words, "somebody's responsible."  *Id.*  In short, Turner believed Defendant Otwell should have made sure Turner received medical treatment.  *Id.* at 17.

With respect to Defendant Ghormley, Turner believed her liability was the same as Defendant Otwell's—based on the chain of command.[8]  (ECF No. 31-2 at 17.  With respect to Defendant Cornelius, Turner testified she was the one drawing up his insulin and damaging the

---

[8] No affidavit was submitted by Defendant Ghormley.

needles.[9]  *Id.* at 18.   In connection with Defendants Otwell, Ghormley, and Cornelius, Turner testified his issues with them were based on the delay in the provision of insulin and the needles being bent.  *Id.* at 21.

## II.   LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co*., 165 F.3d 602, 607 (8th Cir. 1999).  A fact is "material" if it may "affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

---

[9] Similarly, no affidavit was submitted by Defendant Cornelius.

### III.    DISCUSSION

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and, must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988). The Court will address each summary judgment motion in turn.

### A.    Defendant Elkin's Motion

Defendant Elkin moves for summary judgment on the following grounds: (1) the undisputed facts do not equate to a constitutional violation; (2) he is entitled to qualified immunity; and (3) no official capacity liability exists because he is not a public official and there is no underlying individual liability.

### 1.    No Constitutional Violation

The Constitution requires prison officials to provide pretrial detainees and convicted prisoners with constitutionally adequate medical care. *Hancock v. Arnott,* 39 F.4th 482, 486 (8th Cir. 2022).   "What the Constitution considers 'adequate' in a prison or a jail is significantly different than what a member of the general public would consider 'adequate' for his or her own purposes." *Curtis v. Taylor,* Case No. 4:22-cv-00328, 2023 WL 2499956, *4 (E.D. Ark. March 14, 2023).   The Constitution "guarantees a minimal standard of care—pretrial detainees' and prisoners' serious medical needs will not be ignored. *Id.* at 6.  Officials may not turn a "blind eye to unmet serious medical needs." *Id.*

Although Turner was a pretrial detainee during the period at issue in this case, and his claim is brought under the Due Process Clause of the Fourteenth Amendment, the Eighth Circuit has continually applied the Eighth Amendment's deliberate indifference standard to claims brought by

pretrial detainees.[10]  *See e.g., Smith v. Lisenbe,* 73 F.4th 596, 600 (8th Cir. 2023).  "Prison officials violate the Due Process Clause of the Fourteenth Amendment when they show deliberate indifference to a pretrial detainee's objectively serious medical needs." *Reece v. Hale,* 58 F.4th 1027, 1030 (8th Cir. 2023).

The deliberate indifference standard includes "both an objective and a subjective component: '[Turner] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Smith,* 73 F.4th at 600.

To demonstrate that he suffered from an objectively serious medical need, Turner must show he "had been diagnosed by a physician as requiring treatment" or had an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citation omitted).  Turner was diagnosed with diabetes while incarcerated in the ADC.  There can be no doubt diabetes is a serious medical condition.  According to the American Diabetes Association, 11.6% of the population has diabetes with 1.2 million people being diagnosed every year.[11]  Uncontrolled diabetes can lead to severe, and in some cases, life-threatening complications including cardiovascular disease, chronic kidney disease, eye disease, neuropathy, and foot and skin complications.[12]

---

[10] In *Spencer v. Knapheide Truck Equip. Co.,* 183 F.3d 902, 906 (8th Cir. 1999), the Eighth Circuit acknowledged that pretrial detainee's claims may be entitled to "a more stringent standard than deliberate indifference" but applied the deliberate indifference standard as it did not believe the "facts of this case call for a determination of this issue."  The Court further stated that "[r]egardless of whether framed as a subjective or objective test, the alleged deprivation must still be 'sufficiently serious' and 'pose a substantial risk of serious harm.'"  *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)).

[11] https://diabetes.org/about-diabetes/statistics/about-diabetes (accessed May 31, 2024).

[12] https://diabetes.org/about-diabetes/statistics/about-diabetes (accessed May 31, 2024).

For the second prong, the deliberate indifference standard establishes a high threshold that goes well beyond negligence or gross negligence. *Landford v. Norris,* 614 F.3d 445, 460 (8th Cir. 2010). There must be evidence Defendant Elkin "recognized that a substantial risk of harm existed *and* knew that [his] conduct was inappropriate in light of that risk." *Shipp v. Murphy,* 9 F.4th 694, 703 (8th Cir. 2021) (internal quotations marks and citation omitted) (emphasis in original). A mere disagreement with the course of medical care does not rise to the level of a constitutional violation. "Grossly incompetent or inadequate care can constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment. Medical care so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care violates the eighth amendment." *Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir. 1990).

In this case, Turner identified himself as a diabetic during intake and indicated he was on medication. He asserts he was not seen or provided with any treatment for his diabetes until March 29, 2023—fifty days after his intake. According to Turner, he had orally been requesting medical care and his mother had been calling the facility seeking care for him. None of these facts have been disputed by Defendant Elkin.

In fact, Defendant Elkin does not address this period when no treatment at all was given other than to argue that he is entitled to summary judgment because Turner has failed to provide any "verifying medical evidence that the prison officials ignored an acute or escalating situation or that [these] delays adversely affected his prognosis." *Holden v. Hirner,* 663 F.3d 336, 342 (8th Cir. 2011) (internal quotation marks and citations omitted).

When a deliberate indifference claim is based on a delay in medical treatment, the "objective seriousness of the deprivation" [is measured] by reference to the effect of delay in treatment. To establish this effect, the inmate must place verifying medical evidence in the record

14

to establish the detrimental effect of delay in medical treatment." *Jackson v. Riebold,* 815 F.3d 1114, 1119-20 (8th Cir. 2016) (internal quotation marks and citations omitted).   The Court finds that it is obvious to a layperson that a diabetic needs medical treatment.   Further, the Court notes that the provision of medical care was precipitated by two things, Turner's filing of the grievance and his treatment by paramedics obtained only after his mother sent an ambulance to the jail. According to Turner, the paramedics determined his blood sugar was high and administered insulin.   This provides at least some medical evidence that the delay in treatment had detrimental effects.[13]

Even after Turner began receiving treatment, Turner states no blood tests were taken to determine his AIC; at times neither he nor the guards who drew the insulin up were sure what type of insulin it was or of the proper dosage of insulin.   There is no evidence regarding the standard of care for the treatment of diabetes.   The record only contains Defendant Elkin's conclusory statements that his treatment of Turner was appropriate and Turner was provided with the "Gold Standard of Care."   Clearly, there is a genuine issue of material fact as to whether Defendant Elkin was deliberately indifferent to Turner's diabetic condition.   Defendant Elkin is not entitled to summary judgment on the individual capacity claim.

### 2.  Qualified Immunity

Defendant Elkin next asserts he is entitled to qualified immunity.   Unfortunately for Defendant Elkin, the Eighth Circuit has concluded that medical care contractors are not entitled to

---

[13] Turner has requested that the Court obtain the medical records of the ambulance visit and treatment by the paramedics.

assert the defense of qualified immunity.  *Davis v. Buchanan Cty., Missouri,* 11 F.4th 604, 622 (8th Cir. 2021).[14]  Defendant Elkin is not entitled to qualified immunity.

### 3.   Official Capacity Claim

Defendant Elkin maintains he is entitled to judgment on this claim because he is not a public official and there is no basis of individual liability.  In his affidavit Defendant Elkin indicates he was the APRN contracted by Nevada County, Arkansas, to provide medical care to inmates.[15]  As such, he can be held liable in his official capacity if the failure to provide adequate medical care was the result of a custom, policy, or failure to train or supervise on his part.  *See e.g., Johnson v. Hamilton,* 453 F.3d 967, 973 (8th Cir. 2006) (must be a showing that there was a policy, custom, or official action of the medical care contractor that inflicted an actionable injury).

A myriad of questions, unanswered by the record, prevent a determination of whether there is a basis of official capacity liability against Defendant Elkin.  Nothing before the Court addresses the terms of the contract; whether the other medical care providers were employed by Defendant Elkin; whether Defendant Elkin was a medical care policy maker; whether Defendant Elkin was responsible for ensuring medication was distributed properly at the NCDC; who, if anyone, reviewed the intake medical information completed by inmates booked into the facility, etc. Defendant Elkin is not entitled to judgment in his favor on the official capacity claim.

---

[14] Defendant Elkin also maintains he is entitled to qualified immunity in his official capacity.  (ECF No. 28 at 4).  Even if independent contractors were entitled to assert qualified immunity, which they are not, qualified immunity applies only to individual capacity claims.  *See e.g., Roach v. Stouffer,* 560 F.3d 860, 870 (8th Cir. 2009) ("immunity, either absolute or qualified, is a *personal* defense that is available only when officials are sued in their individual capacities") (internal quotation marks and citation omitted).

[15] There is no reference to County Facility Healthcare of Arkansas, LLC, in Defendant Elkin's affidavit.

### B.  Motion for Summary Judgment by the County Defendants

Defendants Otwell, Ghormley, and Cornelius argue:  (1) they did not violate Turner's constitutional rights; (2) they are entitled to qualified immunity because they provided Turner with medical care when he requested it; and (3) there is no basis for official capacity liability as there was no underlying constitutional violation and no evidence that a Nevada County custom or policy led to any constitutional violation.

### 1. Constitutional Violation

The applicable deliberate indifference standard was set forth in some detail above and will not be repeated here.  Liability under § 1983 requires personal involvement in the constitutional violations.  *Ashcroft v. Iqbal,* 566 U.S. 662, 676 (2009) (a plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); *Clemmons v. Armontrout,* 477 F.3d 962, 967 (8th Cir. 2007) ("Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights").  The general responsibility for supervising the operations of a detention facility is insufficient to establish personal involvement.  *Keeper v. King,* 1300 F.3d 1309, 1314 (8th Cir. 1997).

Turner believes Defendants Otwell and Ghormley[16] delegated the duties of providing inmates with adequate medical care to the officers under them and to Defendant Elkin but did nothing to ensure that adequate medical care was provided.  Contracting out medical care or delegating to others the duties of providing medical care does not relieve Nevada County of its affirmative obligation to provide adequate medical care.  *West v. Atkins,* 487 U.S. 42, 56 (1988).

---

[16] With respect to Defendant Ghormley, Turner maintains she is liable on the same basis as Defendant Otwell—based on her position in the chain of command.  He maintains she failed to train or supervise her subordinates.  (ECF No. 31-2 at 17).    As previously noted, Defendant Ghormley did not submit an affidavit.

Defendant Otwell's affidavit establishes that Turner advised booking personnel he was diabetic; this fact was noted on the medical page of Turner's intake paperwork. (ECF No. 31-1 at 1). The affidavit contains no mention of what steps are taken by jail personnel when an inmate states at booking that he has a chronic disease such as diabetes. For instance, is the medical intake questionnaire given to medical personnel to follow-up and arrange for any needed medication? If not, who at the facility is responsible for following up? Defendant Otwell does not describe any efforts made to ensure Turner's diabetes was under control until after Turner filed the March 28, 2023, grievance. *Id.* at 2. Beginning on March 29th, Defendant Otwell maintains jail staff began checking Turner's blood sugar levels and providing him with insulin. *Id.*

Defendants Otwell, Ghormley, and Cornelius draw the Court's attention to the fact that Turner had no medications with him when he was arrested; he had no current prescription for insulin; he had no healthcare coverage; and he ran out of insulin approximately two weeks before he was booked in. Defendants appear to be suggesting that these facts somehow relieve them of the affirmative duty to provide adequate medical care to Turner once he was placed in their custody and care. Defendants are wrong.

"Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished." *Crooks v. Nix,* 872 F.2d 800, 804 (8th Cir. 1989) (citing *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)). "It follows that 'where the duty to furnish treatment is unfulfilled, the mere contracting of services with an independent contractor does not immunize the [governmental entity] from liability for damages in failing to provide a prisoner with the opportunity for such treatment.'" *Langford v. Norris,* 614 F.3d 445, 460 (8th Cir. 2010) (citing *Crooks,* 872 F.2d at 804).

If Defendants Otwell and Ghormley, knew all relevant facts about Turner's medical needs, "the unlawfulness of failing to ensure that [he] received adequate treatment would be apparent." *Langford,* 614 F.3d at 461.  Here, the difficulty encountered is in determining what Defendants Otwell and Ghormley knew.  Turner clearly stated he was diabetic when he was booked in. According to Turner, although he did not file a grievance until March 28th, he immediately began orally requesting medical treatment and his family called the facility about his need for medical treatment.  In fact, Turner testified his mother called the ambulance on March 28th.  After March 28th, Turner filed multiple grievances complaining about the treatment he was receiving. According to Defendant Elkin, Defendant Otwell reviewed all requests and grievances submitted by inmates *via* the kiosk.  (ECF No. 29 at 1).

The summary judgment record contains no evidence: describing how the medical questionnaire is utilized or who reviews it; indicating what the procedure is for inmates requesting medical care; indicating how inmates with chronic disease are handled; indicating that the burden is on an inmate with a chronic diseases to do more than notifying the facility of its existence; suggesting any medical personnel were aware of Turner's diabetes prior to March 28th; describing the grievance procedure or how complaints of inadequate medical care are dealt with; indicating how requests for medical treatment made by the inmate's family members are handled; or stating why Turner received no medical treatment prior to his filing the grievance.  Certainly, Defendants could have easily provided at least some of this information to the Court but chose not to.  In such cases, the "so called adverse inference rule" permits the Court to conclude such evidence, if it exists, would be unfavorable to Defendants Otwell and Ghormley.  *Langford,* 614 F.3d at 461-62 (citations omitted).

Once on notice that Turner had a chronic disease, Defendants were obligated to provide Turner with adequate medical care regardless of whether Turner was able to obtain, or maintain, continuous medical care in the outside world.  Once inside the detention center, Turner could not borrow insulin from a friend, control his diet, or even control his opportunities to exercise.  The Court believes there are genuine issues of material fact as to whether Defendants Otwell and Ghormley had knowledge of Turner's medical condition, his need for treatment, the failure to provide treatment at least initially, and of Turner's complaints regarding the medical care he received.

Defendants Otwell and Ghormley may also be held individually liable "if he [or she] fail[ed] to train or supervise the subordinate who caused the violation." *Brockington v. City of Sherwood, Ark.,* 503 F.3d 667, 673 (8th Cir. 2007) (internal citation omitted).  Defendants Otwell and Ghormley

> may be held liable under § 1983 if he or she (1) had 'notice of a pattern of unconstitutional acts committed by subordinates'; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take 'sufficient remedial action'; (4) proximately causing injury to [Turner].

*Livers v. Schenck,* 700 F.3d 340, 355-56 (8th Cir. 2012) (quoting *Anders v. Fowler,* 98 F.3d 1069, 1078 (8th Cir. 1996)).  To "show deliberate indifference or tacit authorization, [Turner] must allege and ultimately prove [Defendants Otwell and Ghormley] 'had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation.'"  *Id.* at 356.

Here, Turner maintains the jail employees who dispensed his insulin were not trained in how to draw the insulin up into the needles, damaged the needles causing him to suffer additional pain and bruising during administration, often did not know the correct insulin dosage, did not always have the necessary supplies, and frequently did not allow him to check his blood sugar despite being on a sliding scale for the fast-acting insulin.  The Court has no information on what

20

supervisory authority Defendants Otwell and Ghormley had over medical personnel including Defendant Elkin.  As previously noted, Defendants do not address the total lack of medical care, explain how medical staff are notified that an inmate has a chronic disease, or suggest Turner's treatment was an aberration.  With the summary judgment record before the Court, there are clearly issues of fact as to whether Defendants Otwell and Ghormley exhibited deliberate indifference or tacit authorization and were on notice of the lack of training and supervision.

With respect to Defendant Cornelius, Turner testified she was the one drawing up his insulin and damaging the needles.  *Id.* at 18.   Turner, however, does not contend Defendant Cornelius intentionally damages the needles; instead, Turner maintains Defendant Cornelius was not trained in how to draw insulin from the vial.  This falls far short of establishing deliberate indifference on Defendant Cornelius' part to Turner's serious medical needs.  Defendant Cornelius is entitled to summary judgment on the individual capacity claim.

### 2.  Qualified Immunity

Qualified immunity shields government officials from liability for civil damages when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims,* 571 U.S. 3, 5 (2013) (internal quotation marks and citations omitted).   The Defendants "are entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to [Turner], establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation, such that a reasonable official would have

known that his actions were unlawful."  *Blazek v. City of Iowa City,* 761 F.3d 920, 922 (8th Cir. 2014) (citing *Pearson v. Callahan,* 555 U.S. 223, 232 (2009)).

The Court must "do more than determine that the law was clearly established in the abstract."  *Reece v. Groose,* 60 F.3d 487, 491 (8th Cir. 1995).  "We must instead 'examine the information possessed by the government official accused of wrongdoing in order to determine whether, given the facts known to the official at the time, a reasonable government official would have known that his actions violated the law.'"  *Langford v. Norris,* 614 F.3d 445, 460 (8th Cir. 2010) (quoting *Miller v. Schoenen,* 75 F.3d 1305, 1308 (8th Cir. 1996)).

It was clearly established by no later than 1999 that to deny a diabetic treatment and then ignore his complaints about the treatment he received violated an inmate's right to adequate medical care.  *Roberson v. Bradshaw,* 198 F.3d 645, 647-48 (8th Cir. 1999) (Reversing summary judgment in favor of the Sheriff where inmate alleged the Sheriff denied him diabetes medication and a special diet without a doctor's prescription resulting in serious physical conditions, delayed access to the doctor, and ignored complaints that the medication ordered was causing him to suffer severe adverse reactions); *see also Blazer v. Gall,* No. 1:16-cv-01046, 2020 WL 999459 (D.S.D. March 2, 2020) ("A diabetes patient is entitled to access to medication and treatment while being held in custody under clear Eighth Circuit precedent.").  Further, a reasonable supervisory official "would have understood that ignoring . . . complaints about receiving deficient medical care contravened clearly established principles of Eighth Amendment jurisprudence."  *Langford v. Norris,* 614 F.3d 445, 462 (8th Cir. 2010).   Defendants Otwell and Ghormley are not entitled to qualified immunity.

### 3.   Official Capacity Liability

An official capacity claim is treated as a claim against Nevada County.  *Brewington v. Keener,* 902 F.3d 796, 800 (8th Cir. 2018).  Neither respondeat superior liability nor vicarious liability attach under § 1983.   *Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 694-95 (1978).  A County can be held liable only where the County itself causes the constitutional violation at issue.  Nevada County may be held liable only if the constitutional violation resulted from: "an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise."  *Jackson v. Stair,* 944 F.3d 704, 709 (8th Cir. 2019).

"A policy is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters."  *Corwin v. City of Indep., Mo.,* 829 F.3d 695, 700 (8th Cir. 2016) (internal quotation marks, alteration, and citation omitted).  "When a plaintiff can point to a municipal policy that either 'violates federal law, or directs an employee to do so,' 'no evidence is needed other than a statement of the municipal policy and its exercise' to establish a constitutional violation."  *Brewington v. Keener,* 902 F.3d 796, 801 (8th Cir. 2018) (quoting *Szabla v. City of Brooklyn Park, Minn.,* 486 F.3d 385, 389, 390 (8th Cir. 2007) (citations omitted)).  Here, Turner's evidence points not to an existence of policy that caused the unconstitutional conduct but to the lack of a policy to ensure the provision of adequate medical care to inmates with chronic diseases.

To establish the existence of an unofficial custom, Turner must demonstrate:

the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Corwin,* 829 F.3d at 700 (quoting *Snider v. City of Cape Girardeau,* 752 F.3d 1149, 1160

(8th Cir. 2014) (internal quotation marks omitted)).  While Turner has argued that he was

continuously denied adequate medical care, he has not attempted to establish the existence

of a continuing, widespread, persistent pattern of unconstitutional misconduct.

The final way Turner may establish official capacity liability is by a deliberately

indifferent failure to train or supervise.

> Nevada County may be found liable for inadequate training of its employees, where
> (1) the county's . . . training practices were inadequate; (2) the county was
> deliberately indifferent to the rights of others in adopting them, such that the failure
> to train reflects a deliberate or conscious choice by the county; and (3) an alleged
> deficiency in the . . . training procedures actually caused the plaintiff's injury.

*Parrish v. Ball,* 594 F.3d 993, 997 (8th Cir. 2010) (internal quotation marks and citations omitted).

In *City of Canton v. Harris,* 489 U.S. 378, 390-91 (1989), the Supreme Court made clear

that the fact that a single officer was unsatisfactorily trained was insufficient.

> Instead, to satisfy the standard [Turner] must demonstrate "that in light of the
> duties assigned to specific officers . . . the need for more or different training is so
> obvious, and the inadequacy so likely to result in the violation of constitutional
> rights, that the policymakers of [Nevada County] can reasonably be said to have
> been deliberately indifferent to the need."

*Parrish,* 594 F.3d at 997-98 (quoting *City of Canton,* 489 U.S. at 390).  Based on the summary

judgment record before the Court, there are genuine issues of material fact as to whether Nevada

County can be said to have been deliberately indifferent to the need for more training.

## IV.    CONCLUSION

For these reasons, it is recommended that:

> (1) The Motion for Summary Judgment (ECF No. 27) filed by Defendant Elkin be
> **DENIED; and**

> (2) The Motion for Summary Judgment (ECF No. 31) filed by Defendants Otwell,
> Ghormley, and Cornelius be **GRANTED IN PART AND DENIED IN
> PART.**  Specifically, it is recommended that all claims against Defendant

Cornelius be **DISMISSED** and Defendant Cornelius be terminated as a Defendant.

**Status of the Referral:**  The referral terminates upon the filing of this Report and Recommendation.

The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

**DATED** this 7th day of June 2024.

/s/ *Barry A. Bryant*

HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE

25